**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| KELLY BLAND, an individual, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THRYV, INC., a Delaware corporation,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 3:26-cv-1438 |

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

---

Plaintiff Kelly Bland ("Bland" or "Plaintiff") brings this class action complaint against Defendant Thryv, Inc. ("Thryv") and all others identified as appropriate defendants ("Defendants") to stop Defendants' practice of making unsolicited telemarketing calls using artificial voices ("robocalls"), making unsolicited telemarketing calls to telephone numbers listed on the national Do-No-Call Registry, engaging in unlawful solicitation, using false outgoing (or "spoofed") telephone numbers, and to obtain redress for all persons injured by this conduct. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

**Procedural Background**

1. On May 4, 2026, Bland filed her original complaint. ECF No. 1. On June 25, Thryv filed its motion to dismiss. ECF No. 8. Under the ordinary operation of Rule 15(a)(1)(B), Bland may amend her complaint until July 16. *See Patel v. Brighthouse Life Ins. Co.*, No. 21-

1260, 2022 WL 2718553, *2 (N.D. Tex. Jan. 25, 2022).[1]

**Nature of the Case**

2. Plaintiff, individually and as proposed class representative for all others similarly situated, brings this action against Defendants for violations of the federal Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") for unsolicited, "spoofed" telemarketing robocalls made by or on behalf of Defendants.[2]

3. Separately, Thryv's telemarketing violates Texas prohibitions against barratry and solicitation. Various law firms hired Thryv to solicit prospective clients (in and outside Texas) via telemarketing. Soliciting clients for attorneys via telemarketing violates Texas law. Tex. Pen. Code § 38.12(a)(2). Bland and others who were "solicited by conduct violating Section 38.12(a) [] but who did not enter into a contract as a result of that conduct, may file a civil action" for a penalty of $50,000 and attorneys' fees under Tex. Gov't Code § 82.0651.

---

1 Bland is mindful that the Court's standing order provides an alternative procedure for motions to dismiss under Rule 12 that is designed to "advance the case efficiently and minimize the cost of litigation." United States District Court for the Northern District of Texas, Procedures for Cases Assigned to District Judge Ada Brown and Standing Order ¶II(C), at https://www.txnd.uscourts.gov/sites/default/files/documents/BrownJSR.pdf.

Under the Court's standing order, (1) defendants must meet and confer before filing their motion, (2) so that plaintiffs have "an opportunity to amend their pleadings once" before the Court considers a Rule 12(b)(6), and then (3) defendants must append a Certificate of Conference consistent with the conference required under the standing order.

Thryv did not meet and confer with Bland before filing its pending motion to dismiss, and its motion does not contain the Certificate of Conference required by the standing order. *Cf.* ECF No. 8. On June 26, Bland contacted Thryv and indicated should could "allege specific facts to address" Thryv's motion to dismiss, but Thryv never responded. In light of the standing order's stated intent to "provide parties an opportunity to amend their pleadings once before considering a Federal Rule 12(b)(6) Motion to Dismiss," Bland hereby files her amended complaint under Rule 15(a)(1)(B). Bland anticipates this is the most efficient procedure that most closely conforms to Rule 15 and the Court's standing order in the absence of a pre-motion conference.

2 Bland does not currently know the names of the vendors and/or telemarketers involved in Thryv's scheme, but expects discovery from Thryv will identify these potential defendants and that she will be in a position to add these parties once they are identified through discovery.

4. Plaintiff, individually and for class members (together, "Plaintiffs"), seeks an injunction and other equitable relief, and an award of statutory damages, and costs and reasonable attorneys' fees, to the members of the proposed classes.

**Parties**

5. Plaintiff Kelly Bland is a resident of Texas. She is the subscriber of a residential telephone listed on the national Do Not Call ("DNC") list, on which she received numerous unsolicited telephone calls from Defendants.

6. Defendant Thryv, Inc. is a Delaware company, which lists its address with the Texas Secretary of State as 350 North St. Paul Street, Dallas, Texas 75201.

**Jurisdiction and Venue**

7. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

8. Moreover, the Court has diversity jurisdiction. Bland is a citizen of Texas. Thryv is a citizen of Delaware and Texas. This Complaint alleges claims on behalf of a proposed class whose members include persons residing outside Texas and Delaware. The proposed class includes members who are not citizens of the same states as the Defendants, and are diverse from Thryv. Bland alleges on information and belief the aggregate of the amount in controversy in these class claims exceeds the sum or value of $5 million and the total number of class members exceeds 100. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

9. This Court has personal jurisdiction over Thryv under Texas Civil Practice & Remedies Code § 17.042 because Thryv committed a tort in this state by directing its telemarketing to residents of Texas, including Plaintiff.

10. Furthermore, Thryv knowingly and purposefully availed itself to the State of Texas when it caused phone calls to be made to Plaintiff's phone with an "817" area code, which is associated with the State of Texas.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) and assignment to the Court's Dallas division is proper, because a substantial part of the events giving rise to the claim occurred in Thryv's headquarters in Dallas County.

**The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227**

12. "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020).

13. In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices. Pub. L. No. 102-243, (Dec. 20, 1991), *codified at* 47 U.S.C. § 227. *See also Mims*, 565 U.S. at 371 ("The Act bans certain practices invasive of privacy").

14. The TCPA (and its implementing regulation) prohibits calls using artificial voices to cellular telephone number. *See* 47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(a)(2). The TCPA provides a private right of action for damages and injunctive relief for such robocall violations. 47 U.S.C. § 227(b)(3).

15. The National Do-Not-Call Registry allows residential telephone subscribers to register their telephone numbers to indicate their desire not to receive telephone solicitations at

those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing within the Registry "must be honored indefinitely or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

16. The TCPA (via its implementing FCC regulations) also prohibits calls to any number that is registered with the National Do-Not-Call ("DNC") Registry. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). The TCPA provides a private right of action for damages and injunctive relief for such DNC violations. 47 U.S.C. § 227(c)(5).

17. Thryv is liable under the TCPA. The FCC's regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶13 (1995). The FCC reiterated this principle in 2013, when it explained that "a seller . . . may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013). "Vicarious liability under the TCPA is governed by the federal common law of agency." *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 743 (W.D. Tex. 2023). *Cf. id*. at 746 (describing TCPA liability for ratification, where Defendants "knowingly accepted the benefits that flowed from the call campaign in the form of increased business"). *See also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) ("no cause to question" precept that "under federal common-law principles of agency, there is vicarious liability for TCPA violations"); Restatement (Third) of Agency (2006) §§ 2.01, 2.03, 4.01 (vicarious liability "may be established by express authorization, implicit authorization, or ratification").

18. The TCPA reflects Congress's intent to preserve the social norms that Americans

answer calls to their telephone numbers. Abusive and deceptive robocalls like those used by Defendants are a scourge on modern society, and represent an increasing threat to Americans' continued use of the telephone system, which relies on the custom that people generally answer telephone calls to their telephone number. The TCPA's legislative history recognized that continued proliferation of telemarketing, left unchecked, would undermine that custom. "Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the telephone at night. [] [I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper); 137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before our home telephones become the receptacles of junk calls in the same way that junk mail often inundates our mailboxes"). The situation has greatly worsened since the TCPA was first passed. Unless the situation improves, Americans will permanently acclimate to the telephone call as a fundamentally untrustworthy medium for free speech and stop answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

**Texas Anti-Barratry Law, Tex. Pen. Code § 38.12(a); Tex. Gov't Code § 82.0651**

19. Soliciting clients for attorneys via telephone violates Texas law. Tex. Pen. Code § 38.12(a). "The offense of barratry, sometimes described as stirring up litigation, has been a crime in Texas since 1876. [] As far back as 1917, Texas outlawed a distinct form of barratry—use of a third party (a "runner") to solicit clients on behalf of a lawyer." *Reynolds v. State*, No. 08-15-00374, 2017 WL 5844970, *1 (Tex. App.—El Paso Nov. 29, 2017, unpublished, citing Katherine A. Laroe, Comment, *Much Ado About Barratry: State Regulation of Attorneys' Targeted Direct–Mail Solicitation*, 25 St. Mary's L.J. 1513, 1519-20, 1524 nn. 28, 30 (1994)).

20. Tex. Penal Code § 38.12(a) has civil as well as criminal remedies. "In 2011, the

Legislature created a civil cause of action [for] prohibited barratry." *Pohl v. Cheatham*, 718 S.W.3d 173, 180 (Tex. 2025). Texas residents who were "solicited by conduct violating Section 38.12(a) [] but who did not enter into a contract as a result of that conduct, may file a civil action against any person who committed barratry" for a penalty of $50,000 and attorneys' fees under Tex. Gov't Code § 82.0651.

21. Under § 82.0651, "a person has a right to be free of solicitation that violates [] Penal Code [§] 38.12 [or Texas] Disciplinary Rule 7.03," and "a plaintiff suffers a 'legal injury' [] when he 'is solicited by conduct' violating those [] provisions." *Nguyen v. Watts*, 605 S.W.3d 761, 782 (Tex. App.—Houston [1st Dist.] 2020). Texas anti-barratry law covers any person who "has experienced a prohibited communication directed toward him or her as a prospective client by or on behalf of an attorney in an effort to gain employment." *Id.* at 779.

**<u>Defendants' Illegal Telemarketing Calls</u>**

22. Thryv hires and uses telemarketers to solicit personal injury clients from across the country (including Texas) through aggressive outbound telemarketing campaigns using offshore call centers.

23. On information and belief, Thryv's clients are personal injury law firms ("Clients") who pay Thryv in exchange for potential personal injury clients ("Leads") which Thryv procures via its telemarketing campaigns.

24. Thryv uses illegal telemarketing campaigns to promote its Clients' legal services. Thryv derives income by procuring Leads for its Clients, so these telemarketing campaigns are conducted for Thryv's benefit and on its behalf. Thryv's telemarketers initiate telemarketing calls to telephone numbers on the Do-Not-Call registry, assess the called parties' need and/or interest in the Clients' services, then transfer the recipients to the Clients.

25. Thryv and its telemarketers systemically make calls using artificial voices (“robocalls”) to cellular telephone numbers and other proscribed numbers. Thryv and its telemarketers systemically fail to honor the national Do Not Call List. None of the Defendants have express consent to call cellular telephone numbers using artificial voices, or to telephone numbers on the Do Not Call List.

26. Thryv and its telemarketers also use misleading or inaccurate caller identification information, including “spoofed” telephone numbers (that is, replacing the actual originating number displayed within recipients’ caller ID systems—which could be used to reliably identify the vendors’ calls—with a falsified ostensible outgoing telephone number) to entice recipients to answer their telephone calls. This spoofing means call recipients are only able to avoid Thryv’s unwanted calls by risking that they miss wanted calls. If Thryv’s telemarketers did not spoof their calls, Thryv and its Clients would incur too much liability for their businesses to be profitable.

27. On information and belief, Thryv and its telemarketers made, and continue to make, these telemarketing robocalls to individuals nationwide without their consent. Thryv ratifies its telemarketers’ conduct by accepting Clients’ payments for Leads generated by their campaigns, and by paying commissions to its telemarketers for Leads, despite knowing that the telemarketing campaigns which generated the Leads violated the TCPA (and other laws). Thryv has knowingly and actively accepted money generated by illegal telemarketing calls, and paid and/or approved payment of commissions to telemarketers for such calls.

28. On information and belief, Thryv operates, manages, monitors, and/or controls these telemarketing campaigns through the data it collects from calls that are transferred to Thryv’s call center(s), from Thryv’s web-based customer relationship management portals

provided to the telemarketers, and from text messages and emails with Leads.

29. Thryv is legally responsible for ensuring it and/or its third-party telemarketers complied with the TCPA, even if it did not make the calls directly. Thryv is vicariously liable for its telemarketers' TCPA violations. There is no material legal distinction between telemarketing calls made by Thryv and/or by call centers who are nomina third parties.

30. On information and belief, the telemarketers used for the telemarketing campaigns alleged in this Complaint were, and are, at all relevant times Thryv's actual agents, ostensible agents, conspirators, partners, alter egos, joint venturers, and/or employees, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization, and ratification of or by Thryv.

**Plaintiff's Individual Allegations**

31. **Bland's DNC Number:** Bland's telephone number—(817) XXX-2161 (the "Number")—is a cellular telephone, and has been registered with the National Do-Not-Call Registry for over ten years. Bland uses the Number for personal, family, and household purposes: this is her residential telephone number.

32. **Defendants' December 2025 Telemarketing Campaign:** At about 10:47 am, on December 1, 2025, Bland received a telemarketing call (the "Call") to her Number from Thryv or its telemarketers, using a spoofed outgoing telephone number (865) 600-0557. Thirteen minutes after the Call began and while the Call was ongoing, at 11:00 am, Thryv sent a telemarketing text (the "Text") to the Number from Thryv's 85100 short code.

33. **The Call:** At the start of the Call, there was a pause, a ringing, and then a click or similar connection noise, consistent with use of a predictive dialer or some other automated

dialer. After the connection noise, the Call used an artificial voice to identify the caller and provide a fictitious, generic trade name ("Avery with Accidental Claim Helpline"). "Avery" asked Bland questions to qualify her as a Lead.

34. Bland understood from the circumstances (including "Avery's" artificial voice, the questions posed, and the generic, fictitious trade name provided) that the Call violated the TCPA and was criminal under Texas law. Bland knew from experience the Call did not provide enough contact information to identify the ultimate source of the call or for her to place herself on the appropriate internal Do Not Call List, and that she would continue to receive the same or similar telemarketing solicitations without further action on her part. 47 C.F.R. § 64.1200(d)(4). This meant Bland had no options to stop the illegal telemarketing solicitations except by identifying the source of the solicitations (Thryv) and collecting evidence to prove her claims against it. In order to identify the source (which she has since identified as Thryv) and its Clients, Bland had to qualify as a Lead. So Bland stated that she had been involved in a car accident. Bland had not been involved in such a car accident, but rather sought to identify the ultimate source of the Call.

35. **Paul:** "Avery" then transferred Bland to a telemarketer with a strong South Asian accent, who gave the name "Paul." Paul asked additional questions to qualify Bland, including her name, the date of the putative accident, whether she had an attorney, whether she was at fault. Bland gave "Paul" an assumed name and answered his questions in order to identify the source of the Call.

36. **Shane:** After Bland answered Paul's question about whether she was at fault, Paul patched in his "specialist." The specialist identified himself as "Shane from Auto Claims Solutions," but spoke in the same accent as Paul and (on information and belief) worked at the

same call center.

37. Shane asked additional yes or no questions about Bland's putative accident and injuries, to qualify Bland as a Lead. While she answered some of Shane's questions, Shane asked Bland's permission to transfer her to a "network of lawyers," notwithstanding the Number's registration with the Do Not Call List. Shane coached Bland on what to say after he transferred her, specifically that she should say she was interested in speaking with an attorney and that her accident was no more than two years ago. Shane then attempted to transfer the Call to one of Thryv's Clients.

38. **The First Client:** Shane attempted to transfer the Call to one of Thryv's Clients. (In the first transfer, the Client's legal assistant with an American accent answered the Call "Law Office," and the connection to the Client dropped.) On Shane's second attempt, Bland was able to speak with a legal assistant, who identified the Client as the Law Office of Vicki McCarthy. When Bland indicated she had been transferred with respect to a car accident, the legal assistant indicated that the Client had stopped representing car accident plaintiffs several years prior. Bland had no other connection or interaction with the Law Office of Vicki McCarthy: indeed, this incident was the first time Bland had ever heard of the Law Office of Vicki McCarthy.

39. **The Text:** During the Call, at 11:00 am on December 1, 2025, around the time Bland was speaking with "Paul," Thryv sent the Text from its SMS short code 85100. Texts sent to 85100 receive replies which identify 85100 as Thryv's short code:



40. The Text stated, in relevant part, "Law Office of Vicki McCarthy: REPLY YES to receive these automated recurring marketing messages." A true and correct screenshot of the Text is set forth below:




The Text requested for Bland's consent to continue receiving marketing messages, but indicated consent was "not required for purchase." Thryv sent the Text for the purpose of encouraging the purchase of legal services from the Thryv's Client, the Law Office of Vicki McCarthy. The timing of the Text and the Call and the Text's content provide a clear link between the Text and Call, and clearly indicate coordination between Thryv and the callers. Bland further alleges on information and belief that the Text was in Thryv's possession at the time it filed its motion to dismiss. *Cf.* Mot. at 4 ("Plaintiff pleads no facts tying the events together other than proximity in time. She does not allege the content of the text").

41. **The Second Client:** After the first Client's legal assistant disconnected from the Call, Shane said he did not know what was going on (with respect to the Law Office of Vicki

McCarthy no longer representing car accident plaintiffs) but transferred Bland to another Client. The Call was placed on hold for a few minutes, while an automated message played ("Your call is very important to us. Please stay on the line and you'll be transferred to the next available agent.")

42. **Sean:** Ultimately, another telemarketer with a South Asian accent picked up the Call, identifying himself as "Sean from AutoFair Solutions." "Sean" asked Bland the same set of questions that Shane had asked to qualify her as a Lead. After Bland answered these questions, Sean told her that it looked like the Number was on the Do Not Call List, and ended the Call.

43. On information and belief, Paul, Shane, and Sean all work at the same call center. Sean's questions were intended to buy time to try to transfer the Call to a second Client. However, the second Client's telephone system did not accept the Call (either because the Number is on the Do Not Call List or because the Number is on a blacklist from Bland's prior litigation against telemarketers).

44. Again, Bland had not been in a car accident and did not seek legal services from Thryv's Clients, and did not inquire about those services. Bland's interactions with Defendants and their telemarketers were limited to what was needed to identify the source of the solicitations.

45. **The First Client Identifies Thryv:** The next day, Bland emailed the Law Office of Vicki McCarthy to identify the source of the Call. In response, that Client denied that she had called Bland or authorized Thryv to call Bland but stated, in relevant part:

> I have a very basic advertising package with Thryv which simply provides my name being listed when someone searches for attorneys in Midlothian, TX, or a surrounding area. I specifically excluded marketing campaigns (texting/calling/emailing, etc) from my advertising package when the account was set up because I only wanted a very basic internet presence during web searches.

> Since your phone calls and email last week, I have been working around the clock with Thryv Client Services and their IT department to figure out how you received a phone call which was routed to my office, and text message with my name on it, as neither was initiated from my office nor anyone associated with my office. Based on their records, they confirmed that my office never initiated the phone call or text message to you. It appears that your phone number came through to my office via an unknown Yellow Pages tracking telephone number, (945) 899-5535, two (2) times. Your first call came in at 10:59am, the call was six (6) seconds long, and the call did not connect. Your second call was at 11:00am which was when you spoke with my legal assistant. []

46. **Thryv Injured Bland:** Thryv's telemarketing inflicted actual injury on Bland by invading her privacy. Thryv caused Bland the harm inherent in unsolicited, harassing, and deceptive telemarketing calls (including emotional distress, aggravation, nuisance, loss of use of her telephone, wasted time, invasion of privacy, and diverting attention away from her daily activities).

**<u>Thryv's Telemarketing Scheme</u>**

47. On information and belief, Thryv and its telemarketers participated in a common scheme using a common script developed to help qualify Leads for Thryv's Clients in the telemarketing campaigns alleged above.

48. Thryv contracted with the Clients to obtain payment for Leads, and contracted with vendors to procure Leads. Thryv operates a customer relationship management (CRM) platform to collect data about Leads from its vendors, to assign Leads to its Clients, and to facilitate transferring Leads to Clients.

49. On information and belief, Thryv also designed procedures for qualifying Leads which are an integral part of its scheme. Thryv managed and controlled its vendors' telemarketing campaigns via its CRM platform to ensure its vendors complied with its qualification procedures, and to send text messages from 85100. The callers' apparent authority to act on Thryv's behalf is readily inferred from the callers' continued access to Thryv's CRM

system.

50. Thryv planned, monitored, managed, controlled, and conspired to conceal its telemarketing campaigns. Thryv authorized and supervised its telemarketing campaigns, and assigned Leads to different Clients. On information and belief, Thryv procured and managed the telemarketers who called Bland, and trained them to access and use its CRM platform and other systems that stored Lead data, and controlled its telemarketers by creating, restricting, and/or revoking their login credentials to these systems at its discretion. Defendants thereby controlled the timing and manner of their telemarketers' telemarketing calls.

51. Thryv controlled the manner and means of the telemarketing campaigns through interim instructions. On information and belief, Thryv: (1) gave frequent feedback to its telemarketers (including, ultimately, the commissions it paid); (2) had access to or controlled the telemarketers' call records; (3) retained the right and ability to collect audio recordings of the telemarketers' outgoing calls on demand, and routinely reviewed such recordings for quality control; (4) controlled telemarketers' login credentials for its CRM platform; (5) closely monitored how the telemarketers used its CRM platform, so it could (for instance) attribute calls to particular telemarketers and pay commissions based upon successful Lead transfers; and (6) requested ostensible evidence that Leads had consented to receive these telemarketing calls.

52. Thryv ratified the telemarketers' unlawful telemarketing under this scheme. Thryv ratified its telemarketers' conduct by accepting Clients' payments for Leads, and then paying commissions to its vendors and/or telemarketers for Leads—despite full knowledge that those Leads were generated via illicit telemarketing.

53. **Thryv Conspired to Conceal Its Telemarketing:** Thryv consciously agreed to implement the scheme alleged herein, notwithstanding the terms of any written contract it may

have executed with its Clients or vendors.

54. The scheme involves various precautions and measures (including Thryv's qualification procedures) taken by Thryv and its telemarketers to avoid identifying: (1) Thryv at all or (2) the Clients, until the Leads are transferred to a particular Client. Instead, all persons involved in the scheme used fictitious, innocuous trade names to obscure their identities and conceal the scheme.

55. To the extent Thryv's written documents (including contracts, internal DNC policies, or emails) state that telemarketers were not to violate the TCPA or to only contact Leads by email, they are an effort to manufacture plausible deniability and do not reflect Thryv's actual intent or agreement. In fact, the scheme alleged herein reflected the unwritten terms of Thryv's real, operative agreement—even when that contradicts Thryv's written documents.

56. **Spoofing:** Thryv and its telemarketers use misleading or inaccurate caller identification information, including "spoofed" telephone numbers to trick recipients into answering their telephone calls. On information and belief, Thryv spoofed the Call's outgoing telephone caller ID. Calls made to that number—(865) 600-0557—never connect.

57. **Trade Names:** On information and belief, Thryv's telemarketers used generic and anonymous trade names ("Accidental Claim Helpline," "Auto Claims Solutions," and "Auto Fair Solutions") and spoofed telephone numbers to help Thryv attribute particular Leads and/or calls to specific telemarketers, and telemarketing campaigns. These trade names and spoofed telephone numbers, however, make it intentionally difficult for consumers to identify Thryv and its telemarketers. In particular, many different telemarketers use the "Accidental Claim Helpline" moniker while soliciting for Leads for Thryv and other lead sellers precisely because it complicates consumers attributing specific calls to any particular defendant(s).

58. **Lead Qualification:** Under the scheme, Thryv's telemarketers routinely connected potential Leads with different telemarketers in the same call center, sharing information about Leads. These connections also give Thryv a layer of plausible deniability: it is an attempt to divert blame and TCPA liability to its call center co-conspirators. Thryv's gambit is to argue that it cannot be held liable if its call centers unaccountably passed on Leads that were "transferred" from another (entirely fictitious) call center, thereby violating the (written) terms of their contract.

59. **Intended Effects of Defendants' Scheme:** Thryv knew and intended its telemarketing campaigns would cause the loss of use of recipients' telephones, wasted time, invasion of privacy, and the diversion of recipients' attention away from their daily activities.

60. Thryv knew and intended that its scheme would make it difficult for Leads to avoid or otherwise mitigate its calls (for instance, asking to be placed on Defendants' internal Do Not Call list). Call recipients are only able to avoid Thryv's unwanted calls if they risk missing potentially wanted calls.

61. Likewise, many (likely most) Leads are never qualified and–therefore–never transferred to one of Thryv's Clients, such that the call recipients are never in a position to identify Thryv. Bland had to provide information about her putative car accident before she was transferred to Thryv's Clients. The fact that Bland was ultimately able to identify Defendants vindicated her investigation of Thryv's unsolicited telemarketing for its Clients.

## Class Action Allegations

62. **Class Definitions:** Plaintiff brings this Complaint against Thryv, pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and the following Classes:

**The Robocall Class:**

All persons in the United States who received a telemarketing call using an

artificial voice to their cellular telephone number from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

**The DNC Class:**
All persons in the United States who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

**The Texas Class:**
All persons who received an unsolicited telemarketing call or text while the person resided in Texas from two years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

Excluded from the Classes are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded are the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend these Class definitions based on facts learned during discovery.

63. **Numerosity:** The exact number of members of the Classes is unknown and is not available to Plaintiff at this time, but such information is readily ascertainable by Defendants and their agents' records. The Classes are so numerous that joinder of all members is impractical. Plaintiff alleges that there are at least forty members of each Class.

64. **Commonality:** Plaintiff and the members of the Classes share common experiences receiving calls by or on behalf of Thryv and its Clients. Class members received multiple, uninvited calls to their cellular and/or residential telephone numbers for the purposes of soliciting employment for Thryv's Clients.

65. **Predominance:** In addition, common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual members of the

Classes. Identification of the individuals who qualify as a member of a Class will be sufficient to establish liability to the Class member. The predominant common questions include:

a. Whether Defendants and/or their agents made telephone calls to members of the DNC Class whose telephone numbers were registered with the national Do-Not-Call registry, and/or instituted and maintained procedures and minimum standards prescribed by 47 C.F.R. § 64.1200(d) for making telemarketing calls;

b. Whether Defendants are vicariously liable for any calls by their agents and/or sub-agents;

c. Whether the phone calls constitute "solicitations" as defined by 47 U.S.C. § 227(a)(4);

d. Whether violations were willful or simply negligent;

e. Whether Defendants and/or their agents had legally effective consent to place telemarketing calls to Plaintiff and Class members;

f. Whether Defendants made telemarketing calls to Texas Class members which solicited clients for Defendants' Clients;

g. Whether Plaintiff and Class members are entitled to damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiff and Class members are entitled to treble damages; and

h. Whether Plaintiff and Class members are entitled to injunctive relief and attorneys' fees and costs.

66. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes. Plaintiff is not different in any relevant way from any other members of the Classes, and the relief she seeks is common to the Classes.

67. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes: Plaintiff's interests do not conflict with the interests of the other Class members. Plaintiff has retained counsel competent and experienced in complex class actions, including class actions arising under the TCPA and other consumer protection laws, and they intend to prosecute this action vigorously.

68. **Predominance and Superiority:** The Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Thryv's actions. It would be virtually impossible for Class members to individually obtain effective relief from Thryv's misconduct. Even if Class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

69. **Generally Applicable Policies:** This class action is also appropriate for certification because Thryv has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class a whole. Thryv's policies challenged herein apply and affect members of each Class uniformly, and Plaintiff's challenge of these policies hinges on Thryv's conduct, not on facts or law applicable only to Plaintiff.

70. **Injunctive Relief is Appropriate:** Based on information and belief, Thryv continues to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Thryv's conduct and to prevent irreparable harm to Plaintiff and the members of the Classes for which they have no adequate remedy at law.

## FIRST CAUSE OF ACTION
## (Violation of 47 U.S.C. § 227(b)(1) Against All Defendants By Plaintiff, Individually, and on Behalf of the Robocall Class)

71. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72. Thryv is a "person" as defined by 47 U.S.C. § 153(39).

73. The TCPA prohibits "mak[ing] any call [] using [] an artificial [] voice" to a cellular telephone number without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A), (iii); 47 C.F.R. § 64.1200(a)(1).

74. On information and belief, Thryv and/or its agents routinely makes outgoing calls to cellular telephones using artificial voices in the regular course of the telemarketing campaigns alleged above. Thryv violated 47 U.S.C. § 227(b)(1)(A) by initiating telephone calls to cellular telephone subscribers such as Plaintiff and the other Robocall Class members.

75. Thryv's violations are willful because it knew that Plaintiff and Robocall Class members had not given prior express consent to receive calls using artificial voices which Thryv made or ratified. Because Thryv's violations were willful, the Court should treble the amount of statutory damages recoverable by Plaintiff and the Robocall Class members.

76. Plaintiff Kelly Bland, on her own behalf, and on behalf of the Robocall Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Thryv.

## SECOND CAUSE OF ACTION
## (Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(c) Against All Defendants By Plaintiff, Individually, and on Behalf of the DNC Class)

77. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

78. The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). Where "the court finds that the Defendants willfully or knowingly violated the regulations prescribed under this subsection," it "may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount [otherwise] available . . ." *Id.*

79. The FCC's TCPA regulation provides that "[n]o person or entity shall initiate any telephone solicitation" to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). This prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

80. On information and belief, Thryv and/or its agents routinely makes outgoing calls to residential and cellular telephones in the regular course of the telemarketing campaigns alleged above. Thryv violated 47 C.F.R. § 64.1200(c) by initiating telephone solicitations to wireless and wireline residential telephone subscribers such as Plaintiff and the other DNC Class members.

81. Thryv's violations are willful because it knew that Plaintiff and DNC Class members had not given prior express consent to receive telemarketing calls made to telephone numbers placed on the Do Not Call List and that Thryv called such telephone numbers, or benefitted from calls on its behalf. Because Thryv's violations were willful, the Court should treble the amount of statutory damages recoverable by Plaintiff and the other Class members.

82. Plaintiff Kelly Bland, on her own behalf, and on behalf of the DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Thryv.

**THIRD CAUSE OF ACTION**
**(Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(d)**
**Against All Defendants By Plaintiff, Individually, and on Behalf of the DNC Class)**

83. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

84. The FCC's TCPA regulation also provides that

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made [and] must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. . . .
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any

> other number for which charges exceed local or long distance transmission charges.

47 C.F.R. § 64.1200(d). Again, this prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

85. On information and belief, Thryv and/or its agents violated 47 C.F.R. § 64.1200(d)(4) by making telephone calls for telemarketing purposes which actively concealed the name of the individual caller, Thryv's name, and a telephone number or address at which Thryv or the Clients could be contacted. Specifically, Thryv and/or its agents use deceptive and misleading scripts which fail to identify Thryv or its Clients until after the telemarketer transfers the call. Thryv engaged in the scheme alleged above (including using spoofed numbers) in order to avoid liability for illicit telemarketing. Because Thryv's violations were willful, the Court should treble the amount of statutory damages.

86. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Thryv.

**FOURTH CAUSE OF ACTION**
**(Violation of Tex. Gov't Code § 82.0651 Against All Defendants**
**By Plaintiff, Individually, and on Behalf of the Texas Class)**

87. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

88. Soliciting clients for attorneys via telemarketing calls or texts violates Tex. Pen. Code § 38.12(a)(2). ("A person commits an offense if, with intent to obtain an economic benefit the person [] (2) solicits employment, either in person or by telephone, for himself or for another"). *Cf.* Tex. Pen. Code § 38.01(11) ("'Solicit employment' means to communicate [] by

telephone with a prospective client [] concerning professional employment within the scope of a professional's license, registration, or certification arising out of a particular occurrence or event, or series of occurrences or events, or concerning an existing problem of the prospective client within the scope of the professional's license, registration, or certification, for the purpose of providing professional services to the prospective client, when neither the person receiving the communication nor anyone acting on that person's behalf has requested the communication"), (12) ("'Professional' means an attorney").

89. On information and belief, Clients paid Thryv a commission or other such payment for Leads retained via the telemarketing alleged above. Paying or offering "a person money or anything of value to solicit employment" and accepting or agreeing to accept "money or anything of value to solicit employment" also violates Tex. Pen. Code § 38.12(a)(4), (6).

90. Thryv intended to obtain an economic benefit by telemarketing to Bland and other Texas Class members, and received a commission or other payment from its Clients for Leads that were procured via such telemarketing.

91. Bland and others who were "solicited by conduct violating Section 38.12(a) [] but who did not enter into a contract as a result of that conduct, may file a civil action" for a penalty of $50,000 and attorneys' fees under Tex. Gov't Code § 82.0651.

92. Plaintiff Kelly Bland, on her own behalf, and on behalf of the other the Texas Class members, seeks to recover civil penalties as well as all reasonable costs under Tex. Gov't Code § 82.0651 against Thryv.

**WHEREFORE,** Plaintiff Kelly Bland prays that the Court enter judgment and orders in Plaintiff's favor and against Defendant Thryv, Inc. as follows:

a. An order certifying the Classes, directing that this case proceed as a class action, and appointing Plaintiff and her counsel to represent the Classes;

b. Statutory damages as provided under 47 U.S.C. § 227(b)(3) against Thryv in favor of Plaintiff and the Robocall Class, including trebled damages for willful and knowing violations;

c. Statutory damages as provided under 47 U.S.C. § 227(c)(5) against Thryv in favor of Plaintiff and the DNC Class, including trebled damages for willful and knowing violations;

d. Statutory damages as provided under Tex. Gov't Code § 82.0651 against Thryv in favor of Plaintiff and the Texas Class;

e. Reasonable and necessary attorneys' fees as permitted by law;

g. Injunctive relief under 47 U.S.C. § 227(b)(3) and (c)(5) against Thryv in favor of Plaintiff and the Robocall and DNC Classes; and

f. Such other and further relief as this Court may deem appropriate.

Dated: July 6, 2026 By:________________________________

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

Matthew D. Alison (*pro hac vice* forthcoming)
matthew@iaelaw.com
Indian & Environmental Law Group, PLLC
233 South Detroit Avenue, Suite 200
Tulsa, Oklahoma 74120
Telephone: (918) 347-6169
Facsimile: (918) 948-6190

*Attorneys for Plaintiff Kelly Bland, on her own behalf, and behalf of all others similarly situated*

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: July 6, 2026 By:________________________________________

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Kelly Bland, on her own behalf, and behalf of all others similarly situated*